NOT DESIGNATED FOR PUBLICATION

No. 126,136

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROBERT E. MCINTOSH,
*Appellant*.

MEMORANDUM OPINION

Appeal from Greenwood District Court; JANETTE L. SATTERFIELD, judge. Submitted without oral argument. Opinion filed January 17, 2025. Affirmed in part, reversed in part, and vacated in part.

*Sean P. Randall*, of Kansas Appellate Defender Office, for appellant.

*Tyler W. Winslow*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GARDNER and COBLE, JJ.

PER CURIAM:  Robert E. McIntosh appeals his convictions for disorderly conduct and interference with law enforcement.

There are two issues on appeal:

- Was there sufficient evidence that McIntosh's statements to the officer were "fighting words" to convict him of disorderly conduct? No.

1

- Was there sufficient evidence that the officer was attempting to arrest McIntosh to convict him of interference with law enforcement? Yes.

Accordingly, we reverse McIntosh's conviction and vacate his sentence of disorderly conduct and affirm McIntosh's conviction of interference with law enforcement for the reasons set out below.

FACTUAL AND PROCEDURAL HISTORY

McIntosh was charged with criminal threat, disorderly conduct, and interference with law enforcement after an alleged altercation with a city official, Terry Ward, and a subsequent encounter with Sergeant Michael Cordell of the Greenwood County Sheriff's Office.

Ward served as both the animal control and city code enforcement officer for the City of Eureka. In January 2020, he arrived at McIntosh's residence to respond to a call about a loose dog. McIntosh and Ward had a history of conflict from ongoing disputes about city code violations. During their interaction on that day, McIntosh made a violent, racially charged threat against Ward. The details of that threat are not necessary for this appeal.

Ward reported this threat to his supervisors at city hall. He then spoke with Greenwood County Sheriff's Deputy Michael Lazar and Sgt. Cordell, while they were all standing outside city hall. At the same time, McIntosh drove past them and Cordell shouted at McIntosh to "come here." But McIntosh kept driving.

Both officers ran to their patrol cars and followed McIntosh with their lights activated. They followed McIntosh for three blocks, where he eventually pulled over.

2

Sgt. Cordell approached the vehicle and said, "'I know you heard me say, stop.'" According to Cordell, McIntosh "became immediately aggressive" and responded, "'[Y]ou know what? Fuck you. How about that?'" Cordell asked McIntosh to get out of the vehicle, to which McIntosh replied, "'[F]uck you.'" Cordell then asked McIntosh to get out of the vehicle two more times before ultimately using a taser gun on him.

McIntosh then became "immediately compliant." He got out of the vehicle and Sgt. Cordell placed him in handcuffs. Cordell then took McIntosh to jail, where he was booked for criminal threat against Ward and interference with law enforcement. The State later added the disorderly conduct charge.

McIntosh had a two-day jury trial, where he was found guilty of all three charges. The district court sentenced McIntosh to a controlling sentence of 15 months in prison. McIntosh now appeals two of his three convictions— disorderly conduct and interference with law enforcement.

More detailed facts will be presented as they relate to each claim.

ANALYSIS

1. *There was not sufficient evidence that McIntosh's statements to the officer were "fighting words" to convict him of disorderly conduct.*

A person is guilty of disorderly conduct if they use "fighting words . . . tending reasonably to arouse alarm, anger or resentment in others" that the person "knows or should know will alarm, anger or disturb others or provoke an assault or other breach of the peace." K.S.A. 21-6203(a)(3). Under the statutory definition, "'fighting words' means words that by their very utterance inflict injury or tend to incite the listener to an immediate breach of the peace." K.S.A. 21-6203(c) (adopting language from *Chaplinsky*

3

*v. New Hampshire*, 315 U.S. 568, 572, 62 S. Ct. 766, 86 L. Ed. 1031 (1942); *State v. Huffman*, 228 Kan. 186, 190, 612 P.2d 630 [1980]).

McIntosh argues that the phrases, "[Y]ou know what? Fuck you. How about that?" and "fuck you" towards Cordell were not fighting words and thus this panel must reverse his conviction and vacate his sentence for disorderly conduct.

Unless the defendant's words were *not* fighting words as a matter of law, the ultimate determination is a question of fact for the finder of fact to decide. *State v. Beck*, 9 Kan. App. 2d 459, 463, 682 P.2d 137 (1984). Thus, this issue turns on whether McIntosh's words fail to meet the definition of fighting words as a matter of law.

When sufficiency of the evidence is challenged for a criminal conviction, we review all trial evidence in the light most favorable to the prosecution and determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. Appellate courts "do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations." *State v. Gutierrez-Fuentes*, 315 Kan. 341, 348, 508 P.3d 378 (2022).

The following facts, related to the disorderly conduct charge were presented to the jury:

- After McIntosh pulled over his vehicle, Cordell approached the vehicle and said, "'I know you heard me say, stop.'"
- McIntosh responded, "'[Y]ou know what? Fuck you. How about that?'"
- Cordell perceived this as becoming "immediately aggressive."
- Cordell told McIntosh get out of the vehicle and McIntosh replied, "'[F]uck you.'"

4

- Cordell drew out his taser and told McIntosh to get out of the vehicle again. This time, McIntosh "said he wasn't going to."
- For the third time, Cordell told McIntosh to get out of the vehicle, and again, McIntosh "said he was not going to."
- At that point, Cordell deployed his taser on McIntosh and let it run a five-second cycle.
- Cordell stated his reason for choosing to use the taser was because studies have shown using a taser prior to physical interactions could reduce injuries in both officers and suspects and could lead to a lower level of force than hands-on contact.
- McIntosh became "immediately compliant" and got out of the vehicle.
- Cordell placed McIntosh in handcuffs and placed him in the patrol car.
- Throughout the stop, Cordell used "curse words" against McIntosh, and his language "was probably, you know, from the outside perspective, harsh."

While these were the immediate facts surrounding McIntosh's and Cordell's interaction, the finder of fact may also look to "the intention of the person uttering the language, the person to whom uttered, and all the surrounding facts and circumstances" when determining whether disorderly conduct occurred. *State v. Stroble*, 169 Kan. 167, 170, 217 P.2d 1073 (1950). Thus—as the State emphasizes in its brief—courts must consider the totality of the circumstances in determining whether language constitutes fighting words. *Beck*, 9 Kan. App. 2d at 462.

These additional facts were presented to the jury and, when viewed in the light most favorable to the prosecution, might have been considered as a part of the totality of the circumstances:

- McIntosh had allegedly threatened to use physical violence against another person (Ward) earlier that same day.
- Ward stated, "'Oh, I'm scared to death of the dude. I—it's not the first time that I've had interactions with him. . . . I—I know how he acts.'"
- The threat impacted Ward enough that he would no longer go on calls to the area near McIntosh's residence alone.
- Cordell was aware of the history of conflict between McIntosh and Ward and felt concerned for Ward's safety "when it came to Mr. McIntosh."
- Cordell had also previously interacted with McIntosh when called to his house for various domestic disputes with his girlfriend.
- McIntosh had a "don't tread on me" flag in his front yard and held strong beliefs about his rights to privacy.
- McIntosh had used a racial slur against Ward the same day and had a bumper sticker on his car that read "Certified Peckerwood" which, according to McIntosh, "'means that I'm a true white boy.'"
- McIntosh was opinionated and would "talk back" to police.

While some of these facts may help in understanding the overall circumstances that surrounded McIntosh's stop, most do not relate to Cordell. These facts could probably support a finding that, given the totality of the circumstance, the phrases, "[Y]ou know what? Fuck you. How about that?" and "fuck you" would, by their very utterance, inflict injury, or tend to incite *Ward* to an immediate breach of the peace. See K.S.A. 21-6203(c). Yet the same reasoning does not naturally flow to *Cordell*. The only facts here that directly relate to Cordell is that McIntosh tended to talk back to the police and Cordell had met him before during domestic calls. But that is not enough to support a finding that "[Y]ou know what? Fuck you. How about that?" and "fuck you" were "words that by their very utterance inflict injury or tend to incite the listener to an immediate breach of the peace." See K.S.A. 21-6203(c).

6

Beyond a general totality of the circumstances analysis, other panels on this court have also considered more specific factors such as whether there was any physical action or threat, or any reaction by the officer. See, e.g., *Beck*, 9 Kan. App. 2d at 463 (an "offer to fight . . . addressed to the officers before they entered the apartment" was sufficient to meet the definition of fighting words); *In re E.O.*, No. 108,682, 2013 WL 1339930, at *5 (Kan. App. 2013) (unpublished opinion) (finding that the lack of evidence that the words were accompanied by any threatening movement toward officer was key in finding that they were not fighting words).

And in cases that did not involve officers, other panels on this court have similarly found it important if the profanity did not accompany physical action or threats and occurred during a mutual argument. See, e.g., *State v. Kiraly*, No. 125,190, 2023 WL 2941555, at *4 (Kan. App. 2023) (unpublished opinion) ("'Although the phrase "stupid bitch" is offensive and profane, when said in a mutual argument between two people, unaccompanied by any physical actions or threats, the phrase [does not meet definition of "fighting words"].'"); *State v. Hamilton*, No. 120,729, 2019 WL 6223352, at *3 (Kan. App. 2019) (unpublished opinion) ("no evidence that Hamilton engaged in disorderly conduct by using fighting words" when he used the phrase "'fucking bitch'" during a "mutual argument . . . unaccompanied by any physical actions or threats").

In this case, McIntosh did not use any physical action or make any aggressive move toward the officer at all when he said, "'[Y]ou know what? Fuck you. How about that?'" Nor did McIntosh make any aggressive moves or physical action against the officer when he said, "'[F]uck you'" the second time. In fact, McIntosh's refusing to move and get out of the car was the main basis of contention between him and Cordell. Similarly, McIntosh did not use any threats during his statements to Cordell. After the two statements of "fuck you" described above, he only stated and repeated that he would not get out of the vehicle.

7

Nor did Cordell immediately react to McIntosh's use of profanity. After McIntosh stated, "'[Y]ou know what? Fuck you. How about that?'" Cordell simply told McIntosh to get out of the vehicle. Then, after McIntosh replied "'fuck you,'" Cordell drew his taser, but did not use it and again told McIntosh to get out of the vehicle. Yet even after McIntosh refused again and "said he wasn't going to," Cordell still held off on action and told McIntosh to get out of the vehicle for a third time. Only then, after McIntosh refused for the third time, did Cordell react by using the taser. He was tased when he did not get out of the vehicle, not because of any words he used.

The State disagrees with this analysis, arguing that the tasing was evidence that Cordell "[took] some action against him." But multiple steps occurred between the last time McIntosh said, "'[F]uck you'" and the first time Cordell acted. And rather than being an immediate breach of the peace, Cordell's action was delayed and appeared to be based on rational reasoning—he testified that he chose to use the taser because studies have shown that using a taser prior to physical interactions could reduce injuries in both officers and suspects and could lead to a lower level of force than hands-on contact. This was apparently an alternative to physically removing McIntosh from the vehicle.

Finally, these statements of "'[Y]ou know what? Fuck you. How about that?'" and "'fuck you'" appeared to occur during a mutual argument between McIntosh and Cordell. Cordell originally approached the vehicle in an escalating manner by saying, "'I know you heard me say, stop.'" According to Cordell, McIntosh then "became immediately aggressive." And Cordell also used "curse words" against McIntosh during the stop—admitting that his language "was probably, you know, from the outside perspective, harsh."

Given these facts, even in the light most favorable to the prosecution, a rational fact-finder could not have found that "[Y]ou know what? Fuck you. How about that?" and "fuck you" were "fighting words." As a matter of law, the statements do not meet the

8

statutory definition of "words that by their very utterance inflict injury or tend to incite the listener to an immediate breach of the peace" under K.S.A. 21-6203(c). Thus, there was insufficient evidence to convict McIntosh of disorderly conduct. Accordingly, we reverse McIntosh's conviction for disorderly conduct and vacate his sentence.

2. *There was sufficient evidence that the officer was attempting to arrest McIntosh to convict McIntosh of interference with law enforcement.*

McIntosh next argues that Sgt. Cordell was not attempting to arrest him for the offense of criminal threat, so there was insufficient evidence to convict him under the State's theory that he knowingly opposed Cordell's attempts to arrest him by refusing to stop and refusing to exit his vehicle.

Interference with law enforcement includes "knowingly obstructing, resisting or opposing any person . . . in the discharge of any official duty." K.S.A. 21-5904(a)(3). Thus, the State must prove three elements under the statute: (1) the officer was acting in furtherance of an official duty; (2) the defendant had knowledge that the officer was acting as part of an official duty; and (3) that the defendant obstructed, resisted, or opposed the execution of that duty.

In this case, the jury was instructed that it must find: Cordell was discharging an official duty, "namely attempting to arrest Robert McIntosh for Criminal Threat"; McIntosh "knowingly opposed Michael Cordell in discharging that official duty by refusing to stop and refusing to get out of the vehicle"; those acts "substantially hindered or increased the burden of the officer in the performance of the officer's official duty"; and at the time McIntosh "knew or should have known that Michael Cordell was a law enforcement officer."

9

The same standard of review for a sufficiency of the evidence claim discussed under the first issue also applies here. See *Gutierrez-Fuentes*, 315 Kan. at 348.

The Kansas Supreme Court has held that "there is no distinction between direct and circumstantial evidence in terms of probative value." *State v. Potts*, 304 Kan. 687, 694, 374 P.3d 639 (2016). And juries are entitled to make reasonable inferences based on the evidence presented. 304 Kan. at 694. An inference is sufficient to support a conviction if the evidence reasonably tends to support the inference. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). This evidence "'need not rise to that degree of certainty which will exclude any and every other reasonable conclusion.'" 304 Kan. at 25 (quoting *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 551, 431 P.2d 518 [1967]).

McIntosh argues that when he allegedly refused to stop the vehicle, Cordell had neither decided nor attempted to arrest him for criminal threat or any other crime. And when McIntosh allegedly refused to exit the vehicle, there was no evidence that Cordell was attempting to arrest him for criminal threat.

But the following evidence was presented to the jury that could reasonably be used to support an inference that Cordell was attempting to arrest McIntosh:

- Cordell originally told Ward that he "might arrest" McIntosh, but he wanted to speak to McIntosh first, so he planned to go investigate and discuss the criminal threat with McIntosh.
- But then Cordell saw McIntosh drive past city hall, and Cordell perceived the purpose of this drive-by as either intimidation or seeking confrontation, which convinced him that "maybe a custodial arrest was the best route."
- Cordell then shouted at McIntosh to "come here."
- When McIntosh did not stop, Cordell ran across the street to the sheriff's office, got in his patrol car, and activated his lights and siren.

10

- Once McIntosh pulled over, Cordell approached the vehicle and said, "'I know you heard me say, stop.'"
- Cordell told McIntosh to get out of the vehicle, and ultimately tased McIntosh when he continued to refuse.
- After McIntosh exited the vehicle, Cordell's very next action was to place him in handcuffs.
- Cordell patted McIntosh down, removed a knife from his belt, and placed him in the patrol car.
- Cordell then took McIntosh to jail, where he was booked for criminal threat against Ward and interference with law enforcement.

Viewing this evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found that Cordell was attempting to arrest McIntosh. Thus, there was sufficient evidence to convict McIntosh of interference with law enforcement. Accordingly, we affirm his conviction.

In conclusion, we reverse McIntosh's conviction of disorderly conduct because there was insufficient evidence to support a finding that his words were "fighting words" and vacate his sentence. But we affirm McIntosh's conviction of interference with law enforcement because there was sufficient evidence to support a finding that Cordell was attempting to arrest McIntosh.

Affirmed in part, reversed in part, and vacated in part.